Good morning, Your Honors. Andrew Parnes, I'm appearing on behalf of Daniel Martinez-Brambilla. I'm going to take the first round of this, and I think we decided among the three attorneys that we would reserve five minutes for a rebuttal. May it please the Court, Andrew Parnes for Mr. Martinez-Brambilla. I'd like to discuss first the safety valve issue. In this case, Mr. Martinez-Brambilla gave a complete statement which has never been shown to be false. It was used by the government at trial to convict him, and there's an issue regarding its use against the other defendants. He admitted that he had- Are you talking about the statement of the probation officer? Well, I'm talking about, first of all, the statement that he gave to the officers when he was arrested, which is included in the PSI as his statement. And that's never been-there's never been an allegation that that was false in any way. He acknowledged that he was contacted by Mr. Toffia and that he had told him about other possible sources. He had provided that information. And in this case, unlike the- We have a case that tells us that the probation officer is not the government for purposes of the safety valve. That's correct. But the probation officer is not this is not a statement that was given to the probation officer. It was a statement that was given to the government and that was used by the probation officer in calculating. And that's at pages 26 and 27 of the PSI. And this is very much like two other cases. I ask you that question because I've heard at some discussion that probation officers are now sworn law enforcement officers. Do you know anything about that? I honestly don't, Your Honor. It might make a difference. It might make a difference in a case where the statement is given to the probation officer, but it doesn't make a difference in this case because the probation officer is just taking the statement that my client gave directly to the government agents at the time of his arrest. And in the cases of Shrestha where the defendant gave a statement, later recanted that statement, the court found that that person was still entitled to safety valve consideration for the initial statement because it was a good faith effort to do that. In Mejia Pimentel, the defendant gave a false statement to the police, initially repeated that statement, and then eventually told the truth and still got consideration under the safety valve. So here we have a situation where he gave a statement that's been used, but never shown to be false, never recanted, and yet he was not given an opportunity to get advantage of the safety valve. And that was the only basis for the denial of the safety valve. And there was some question about whether after trial he met with the officers and he just basically said, I don't have anything else to say. It's a very thin record from both sides. But once that cooperation was shown and used by the government, then they certainly have the burden of showing that the information was not given in good faith, that it was not full and complete, and that's certainly no showing there.  or whether the defendant in this case should be remanded in order to be resentenced on that basis. Let me brief. So the statement that was given was the subject of also was the subject of evidence at trial. That's correct. And the argument that the government made was that the jury found against the defendant, connected the defendant, so obviously believed. I'm not sure what he was arguing. Did he believe that the statement was true? Sure. I mean, there was never a challenge to that statement. They sought to use it. They made reference to it in opening statements in greater detail than they were eventually allowed to do at the trial. But there's never been any contention that anything that Mr. Martinez Brambilla said to the police was false. So then the court's response is, well, I don't know why we need to get into that. The jury has spoken. And this is during the sentencing hearing, so I'm not following that. I wasn't at the trial. I wasn't the trial attorney. Trial lawyer. So I'm not sure. And certainly the record is not as complete as it might be. But the court held it against my client when, in fact, the burden should have shifted to the government to show that it was not given in good faith that it was false or inaccurate information. And at that point, it was the government had adopted it. If I might briefly talk about the issue of the quantity. In this case, the judge felt bound by the verdict of the jury that there was more than 500 grams involved. And so it's clear the dispute is whether it's a pound or more than a pound. If it's a pound, it's under the 500 grams. It's 454 around that. And the government, in its opening, said that as far as Mr. Martinez-Brambilla was concerned, that there was at least one pound. And that's at page 2 of the transcript. And he again says there's at least one pound in the statement at page 17. The issue for this Court is the instructions. The instructions were not limited in this case in any way, shape or form to advise the jury of what they should consider in the 500-gram determination. And in fact, the government, in dealing with that issue of quantity, the only reference in closing arguments at page 1586 is that there were transactions that occurred long before Mr. Martinez-Brambilla was involved in the conspiracy that amounted to more than 500 grams. And the jury could return its finding of 500 grams involved in the conspiracy simply based on that prior evidence. When you look at what Martinez-Brambilla's involvement was, it's certainly unclear whether it was just for a pound or for more than a pound. And the Court felt bound by the verdict. And yet the verdict is flawed because the jury instructions are flawed. And that the – and that issue is raised as plain error because it was not addressed. But there's no instruction in Question 6 in the special verdict as to how the jury is to consider whether or not this is more than 500 grams as to Mr. Martinez-Brambilla. I'm going to – I'm turning it over to them. Thank you. Good morning, Your Honor. John Cutler. I'm the attorney for the appellant Romero Pimentel-Garcia. In this case, we initially filed the briefs as an Anders brief and listed two issues. I'm going to start with the second issue, and that is the issue of the government referring to evidence in his closing arguments that was not admitted in trial. And I think the real – with the limited time that I have, I'm not sure if I understand the clock. Do I have the full 11 minutes? No, no. You're sharing?  Okay. Thanks. With the limited time, Your Honor, I think one of the questions the Court needs to decide is whether it's plain error, standard, because I did not object in the closing arguments to it, or whether the arguments made prior to the closing arguments amount to an objection or at least putting on notice this issue, and then in which case the harmless error with standard would apply. Quite frankly, with the evidence that was presented in trial, I'm not – and I'm just being honest with the Court, I'm not sure it matters that much which one you pick. The evidence was quite substantial against Mr. Pimentel. The only thing Mr. Pimentel lost in that argument was that it's clear the agent followed him from the controlled by to the jail and then put – and that there Mr. Pimentel used ID at the jail to identify himself, but the only link missing is whether or not that money was money from the controlled by, but there's other evidence in the record that shows that from the informant and others that that money was given to Mr. Pimentel. So I don't know if you have any questions on that, but my argument would be that the arguments that occurred prior to the closing arguments could amount to an objection or at least put on notice that this issue was there. The Court itself, I think, in the transcript, page 1533, even made the comment that I'm not sure exactly what Officer Donahue testified to, however, I did not make an objection, and there's various reasons, strategy reasons or whatever, why I didn't object to someone's closing arguments, and I didn't make that objection. The other issue is a brutal issue. It is shared, I guess, with Mr. Tafoya. It's actually more Mr. Tafoya's issue. And briefly, I think the government did a good job of sanitizing the statement. The question that I would raise is whether or not the setup to the question was sufficient enough to point a finger that this was clearly Mr. Pimentel or Mr. Tafoya that was involved. And on that issue, I felt the statement was fairly well sanitized, that it was a statement, an out-of-court statement of a co-defendant that was clearly linked later with other evidence. I don't know if you have any questions on those two issues. Otherwise, I'll give any other time that I'm not sure what's remaining to Mr. Barnum. Thank you, Your Honors. Thank you. Thank you, Your Honors. Randall Barnum, attorney for the appellant. Eugenio Tafoya Gonzalez. Just briefly with respect to the brutal issue, I think Mr. Cutler covered that one. I made the objection at the trial that I think certainly points to the fact that, of how you sanitize the statement or what words you choose, the only inference that could be drawn was that my client was implicated in that case. And then next, turning to the sentencing issue that was raised by the court with respect to at sentencing, I had made the argument for a 240-month sentence, which was the minimum sentence that could be imposed for the continuing criminal enterprise. I believed it was appropriate based upon the 3553A factors. The court disagreed and certainly strongly disagreed in their statement that was in both the appellant's opening brief as well as the government's brief. We saw the guidelines hitting the case directly on. It did fall within the guidelines range, but we did believe that it was excessive in light of the particular facts before the court and argued such before the court. Unless the court has questions of me, thank you. Thank you. Thank you. Your Honors, may it please the Court, counsel. My name is Michael Fica. On behalf of the United States, I would note, Your Honors, that I was an attorney of record for the government at the trial in this case as well. With the Court's permission, Your Honors, I'd like to start with an issue that was raised in Mr. Cutler's Anders' brief, that being the argument that there was a misstatement by myself, by the government, during closing argument. I want to start with that by way of making a candid disclosure to the Court here in argument as well as in the briefs, that he's absolutely correct. I did make a misstatement during my closing argument as to the state of the evidence, and I recognize that. I acknowledge that. I also recognize that I had a duty to correct that. I would state, Your Honors, that at the time I made that statement, I was in error, but it was an error on my part that was an honest mistake. My recollection of the evidence that had come in was that Detective Donahue had made that final tie-in. I'd note in this case, Your Honors, that this was a trial that occurred over the series of three weeks. And the evidence in question here came in very early in the trial, and, quite frankly, Your Honors, when I got to the point in closing argument, my recollection was that Detective Donahue had made the statement during her testimony.   I do agree, though, Your Honor, with Mr. Cutler in that, first of all, I take the position that plain error applies. The Court's probably aware from reviewing the transcripts that there was some discussion before the jury was brought in for closing argument as to what exactly Detective Donahue's testimony was.  Even the Court recognized the error on my part. The Court suggested what it thought it was, but made it clear to Mr. Cutler that if he felt that the argument was incorrect, that he was to interpose an objection. His failure to do so creates a plain error review for this Court. And, Your Honor, to that end, we agree with Mr. Cutler that under the plain error standard, there was significant evidence. In fact, and in reality, this was a very small piece of evidence relative to the large evidence that came in as to Mr. Cutler's client. There were numerous controlled buys with Mr. Cutler's client. This actual incident came as a result of a controlled buy, and so, Your Honors, we do believe that there was no error on the part of the – the misstatement did not result in error. I'll address just very briefly the – the Bruton issue that was raised again on the – on the issue of the Anders – raised in the Anders brief. As counsel noted, we did make a significant attempt, Your Honors, to sanitize that statement. The statement was essentially sanitized down to the term that – or the statement that Mr. Brambia put people together to do a drug transaction. As the Court knows that sanitation were a neutral pronoun that does not direct the jury's attention to any particular person is appropriate in this case. Quite frankly, Your Honor, at the time and still to this day, I couldn't think of any more of a – any more of a neutral pronoun than people. And so that's what I went with. It was a strategic decision on our part at the trial, and – and I guess I'll leave it at that unless the Court has any questions about those issues. I would like you to address the sufficiency of the evidence of drug quantity. Certainly. As to Martinez. How – as I understand, the evidence came from a wiretapped conversation. How is that linked with Martinez? Your Honor, there was a series of calls between Mr. Brambia and Mr. Tafoya that were intercepted. And Agent McGoffin, who was the lead case agent in this case, testified that the calls were played. And Agent McGoffin also testified because the calls were in code, and he provided testimony as to his training and experience as to what those calls meant. And I note and I cite to different points in the record, there was some – some sources was in the Portland, Oregon area, and that Mr. Tafoya was headed to Portland to pick up some drugs. Surveillance then had Mr. Tafoya coming to Portland, staying at a hotel that was rented for him by Mr. Brambia. Then there was a series of calls intercepted over several days. The first was – is found at page 939 of the transcript, where they talk about – and again, there's codes, but they talk about getting a chicken at 11-5 and start fitting it in. Agent McGoffin testified that 11-5, $11,500 was – There's $10,500. That's – Your Honor, the $10,500 comes at a later call. Okay. At 939, they talk about a chicken at 11-5. Okay. And that's on one day. And Agent McGoffin states that a pound of methamphetamine at the time was going for $11,500. The next day, again, while we know that Mr. Tafoya is still in Portland, there's another telephone – oh, previously, they talked about getting a chicken at 11-5, and they said, all right, come over, we'll start fitting it in. And Agent McGoffin again testified that based upon his training and experience, they were talking about putting the drugs into a hidden compartment in the vehicle. The next day, Mr. Tafoya and Mr. Brambia have a separate conversation where they talk about getting another one. And then Mr. Tafoya says, well, if it's not garbage, I'll take two. So there's the conversation the first day where they talk about getting one chicken or one something at 11-5. The next day, they talk about getting two more so long as it's not garbage. Now then, and that's at 944. Now then, Mr. Tafoya goes back to Idaho, has a conversation with one of his customers in Idaho that's intercepted. And during that conversation, and this is at 1020 to 1027 of the transcript, the customer says, did you get any? And I'm paraphrasing, obviously, Your Honors. Did you get any? And Mr. Tafoya says, yes, I had to stay there a whole week, but I got some. And again, I'm suggesting that that ties in that the commodity that they're talking about getting in Portland was, in fact, methamphetamine because that was the relationship these two individuals had. Now then, and this is in reference, I think, to Your Honors' question, subsequent to that, subsequent to the trip to Portland and the two conversations, there's another conversation with Mr. Tafoya and Mr. Brambia again. And during that one, he talks about getting one for 10,500, and he talks about getting one and one-and-a-half payment of 1,500. And Agent McLaughlin testified in that case that it would be common, based on his experience, that if a person had the methamphetamine delivered to him, that he would pay $1,500 for the delivery of the methamphetamine. So, again, Agent McLaughlin's talking about, well, that would not be inconsistent. In fact, I guess I shouldn't state that in a negative. I should state that in a positive. That conversation was consistent with getting another pound of methamphetamine for 10,500, but then paying an additional $1,500 to have it delivered to Idaho as opposed to going to Portland to pick it up. So, in essence, Your Honors, we have three separate conversations talking about the obtaining of three separate commodities. They call it 939, where he talks about getting a chicken at 11-5. They call it 944 the next day, where he talks about getting two more if they're not garbage. And then they call it 1114, which occurs almost a week later, where he talks about getting another one at 10,500 and paying 1,500 to have it delivered. I'd suggest, Your Honor, that the evidence – and, again, looking at the evidence in white, most favorable to the government – that this suggests that the jury could have found that, in fact, Mr. Brambilla was involved in four separate – or I shouldn't say four separate counts, but at least four pounds of methamphetamine. If we presume, based upon the first call and the testimony of Agent McGoffin, that referring to one chicken at 11-5, they're talking about pound quantities of methamphetamine. All right. So you didn't cite U.S. v. Contreras in your brief, did you? Pardon me, Your Honor? Did you cite – the safety valve issue. Did you cite U.S. v. Contreras? I – Your Honor, I don't recall if I did cite. I don't think you did. It seems – the case seems to control that issue because it talks about the person to whom the information must be given is the government's attorney, i.e., the prosecutor. And I do recall that, Your Honor. And I believe – if I may, I believe I did cite – I did cite Contreras. I apologize. I did not, Your Honor.    I believe you did cite U.S. v. Contreras. Yeah. So that would be your strongest case, wouldn't it? Correct. Do you – what do you make of the argument that he had previously given the government the information upon which he was convicted? I would frame the issue this way, Your Honor. I think the controlling analysis for the court is whether or not Mr. Brambilla made a good-faith attempt to comply. And really that's the issue this court looks at is whether there was a good-faith attempt made by Mr. Brambilla. We agree that Mr. Brambilla did make a post-arrest statement to the officers, but it was a post-arrest statement. Well, I guess what I'm wondering is, does Contreras exclude the officers as well? I mean, if you give a statement and the government uses it to convict you. And I would suggest to that, Your Honor, that the other requirement – I shouldn't say the other requirement. One of the requirements of the safety valve is that the defendant gives a full and complete statement. Well, it's supposed to give all information related. And the issue – and I do want to note here, we have at page 16 of the appellate's excerpt of record – again, I was trial counsel in this case. Mr. Brambilla in this case did give a post-arrest statement. He answered some of the officers' questions. But at that point, as the Court can see from the facts of this case, this was an ongoing investigation. At that point, the agents didn't ask all the questions that they would have otherwise for purposes of the fact that this case was still being investigated. Defendants had not been all taken into custody. Subsequent to the defendant's conviction, there was a meeting where the defendant attempted to comply with the safety valve. I was present at the meeting, and I note that at page 16 – at page 10 of the transcript, where I say – and I explain to the Court that Mr. Brambilla did sit down with officers and I was there. The interview, I think, lasted about five minutes. Once Mr. Brambilla was confronted with some poignant questions relative – relative – relevant to statements he made, Mr. Brambilla indicated that he no longer wanted to proceed with the interview. Subsequent to his conviction, we set an appointment to sit down and interview Mr. Brambilla for purposes of his qualifying for the safety valve. I was present. It was our intention at that point to ask the full complement of questions relevant to this case so that he could give a full and complete disclosure and qualify for the safety valve. I literally got two questions into that interview. And Mr. Brambilla stopped the interview and said – literally said, I've said all I'm going to say. I'm not answering any more questions. And the interview ended. I would suggest, Your Honors, that that is not a good-faith attempt to comply with the safety valve. Well, what did he tell a probation officer? Your Honor, the probation officer was given the statement that he made to the officers post-arrest. So the probation officer had the benefit of the statements that were made post-arrest. And I'll agree, Your Honor, that that was an extensive statement. The officers interviewed him for an extended period of time. But it was a post-arrest statement. It was a statement that was specifically narrowed to further the investigation at that point in the case. Well, at the point, the post-conviction point, had you already arrested and convicted every person involved in this conspiracy? We don't believe – we don't believe we still have arrested and convicted everybody that was involved in this conspiracy, Your Honor. We believe there still are co-conspirators out there. And you believe that Mr. Aikon Martinez is withholding that? I believe he has information. He could give us information that could potentially further the investigation. The problem is, Your Honor, he would not avail himself to those questions. He literally wouldn't answer my directed questions about the entire scope of this conspiracy. And that sort of cuts to the core of the issue here. To say that the defendant has acted in good faith by essentially saying, I'm going to tell you this, this, this, and this, and that's all, we're done, no more, doesn't constitute good faith. Good faith requires that I have the opportunity, I and my agents have the opportunity to sit down and explore all facets of the relevant conduct of this case. The defendant doesn't get to pick and choose without further disclosure. And I think Judge Windmill alluded to that in his ruling when he said the defendant doesn't get to say, well, this is what I know and it's all I know, the end, because it puts the government in a horrible position of essentially proving the negative when, in fact, the defendant has the obligation at the onset to demonstrate that he said everything he knows relevant to the case. But what about this business of a probation officer not being the government for purposes of the safety valve? Correct, Your Honor. What do you know about that? Well, Your Honor, I'd submit, and I don't have any authority on this, but I heard the Court's question to Mr. Parnes. I'd suggest, while the probation officer does have some, some, some authority over the law enforcement authority in their role as a probation officer. Well, I mean, aren't they sworn law enforcement officers? They are, Your Honor, but they're not actively. When did that happen? When did they become sworn law enforcement officers? I don't know that, Your Honor. I know they carry a gun and they have a badge. Yeah. But, see, I learned for the first time, oh, about a month ago, much to my surprise, that probation officers were sworn law enforcement officers. And I guess I ---- They're no longer social workers. You know that. That ended a long time ago. I don't know. I don't know the answer to that. I do know, as I said, that they have a gun, they have a badge. I also know that, at least in this case, and I think in all cases, the probation officer is not an active part of the investigative team. That, in essence, when they compile the information for the presentence report, they're essentially, in a sense, functioning as an arm of the Court, obtaining information for purposes of the Court. They are not, in that role, functioning as part of the investigative team. As Your Honor mentioned, there may be further ---- Well, they used to be working an arm of the Court. They used to work for the Court as probation officers. But I don't think that's still true. And now I understand they're sworn law enforcement officers. And that may be. I don't know the definitive answer to that. I do know, at least ---- Well, that's true. At least in ---- What do you do with this business of the safety valve? Well, I would state specifically ---- not too pleasant agents out there and a very nice probation officer. And when the defendant comes before the probation officer, he spills the beans and makes all kinds of incriminating statements and provides the probation officer with a lot of information. So why shouldn't that give them the benefit of the safety valve? Your Honor, I see I'm out of time. May I respond to the Court's question? Sure. I would say for several reasons, and I'll speak specific to this case. First of all, at least in this case, the probation officer in this case was not part of the investigative team. So in essence, all the probation officer could do was essentially listen to what the defendant had to say. The probation officer, not knowing the scope of the larger investigation, was not in a position to ask the questions. So while they may be an officer, they weren't an officer relevant to the specific investigation in this case. And to that end, I guess, again, in this case, I would note that we don't have in this case a probation officer. There is nothing in the record that suggests that in this case the probation officer sat down  Essentially, what we're saying, what the defense is stating, is that the probation officer had the benefit or received the post-arrest statement of the defendant, and that should be a disclosure. So we don't even have a situation such as the Court's suggesting here where the probation officer sat down and did an investigatory or an interview seeking out information. So in this case, even if the probation officer could be perceived as being a law enforcement officer for purposes of the safety valve, in this case, there was not an interview that took place. There's no record of an interview taking place where the probation officer actually inquired or questioned the defendant about the entire scope of the relevant conduct. Well, I'm not talking about that anyway. All right. Thank you, Your Honors. Well, you've got a couple of minutes. Just on the safety valve issue, Your Honors, I think we're bound by the record here. We're not bound by Mr. Fica, whom I respect greatly, about what may or may not have happened at conversations that Mr. Martinez-Brembilla, but what's in the record is the fact that Mr. Martinez-Brembilla, when he was arrested, gave a lengthy statement naming people that he tried to put Mr. Tafoya in contact with. There are every other person who was indicted in this case, and a number of them testified, not one of them knew Mr. Martinez-Brembilla. There's no showing that he had any information other than what he knew in Oregon, in Portland, and what he knew possibly about somebody in California, and he named names to the officer. That's what's required. Now, Mr. Fica says, well, there may be people in the conspiracy that they wanted to know about. There's nothing in the record about that. There's no specifics. And as the Shrestha case that I rely on in the brief talks about, that this is exactly the situation. In that case, the defendant basically gave a statement and then actually recanted and may have purged himself at trial, and yet he was still eligible for the safety valve. And the court noted that once the showing's been made that he eligible for the reduction, that falls to the government to show that the information supplied is untrue or incomplete. And there's no showing by that in this matter. The record is scanty, I would agree, but that's the government's burden to show that, and they have not done it in this particular case. And so to come and say, well, there may be other people who are out there and so on, if they're the people that Mr. Martinez Brambilla mentioned, Ricardo Sanchez, another person that he possibly knew down in California, if that's the information, then he's already told that, and there's no reason that he should suffer from that. I mean, this is a person who had no prior record, met all the other criteria, was by, I think the government's own admission, was tangentially involved as somebody that Mr. Tafoya came to to try and hook up with other people to get drugs. So I think in this case, the government's not met. It's just showing. The government's showing is that the government not the government's showing has nothing to do with the statement made at the time of the arrest. The government's saying, well, we had a meeting after his conviction, and we asked him for information, and he said, that's all I'm giving you. That's the government's showing. The government's showing, again, it wasn't subject, it was not a very full hearing at sentencing, and I acknowledge that. And I think it's just basically the judge says, well, do we need a hearing? And the attorneys at the trial, at the sentencing say, oh, no, we don't need a hearing.    They couldn't have given the Supreme Court that kind of interpretation of the sentence. So they have expectations, but they have not known.  Now, I don't know how Japan's attorneys waved the hearing on this. What do you think Japan's attorneys waved the hearing on this? Well, I don't know Jennifer. They may very well have waived a hearing, a full hearing on it. But the record, I think, is enough to show that the burden shifted to the government and the government, in essence, waived the hearing and just made these statements. And the court and the trial judge said that he would take this as no good faith. And that the cases are replete with what good faith is, and I think that Mr. Martinez-Perempia did that. And especially in a situation where he didn't get on the stand and deny anything, he didn't testify at the trial. And so there is no showing that the information was false or incomplete. And therefore, he should be entitled under the fifth factor to the safety valve. And it is a significant difference in this matter. It could be a – it could cut the sentence significantly down to somewhere in the neighborhood of potentially even into the 65 to – 63 to 78-month range, if not the 78-month range. And it's clear, I think, that Judge Windmill probably would have done that had he been able to. But he felt that he was constrained by the statutory minimum mandatory, which is what he imposed. So he – that Mr. Perempia met all the other criteria? No. I think that's uncontested. Okay. Everybody agrees that the only issue is the providing the information. And it's not – you know, again, it's not 5K1 information. It's just to say who he was involved with. And there's no claim that he knew anybody back in Idaho other than Mr. Tafoya. And he – There's no evidence. There's just argument. Right. There's no – there's little evidence other than the statement. So really the only way that – I mean, really what the government has to hang its hat on is the Contreras case, that Mr. Perempia had to provide the information to the government's attorneys, or else it didn't count. And I would argue that giving that information at the time of the arrest that's used by the government in the trial is giving that information to the prosecution. And if it – you know, in a sense under, you know, different analogy, but under Kiles v. Whitley, that it's – if the agents know it, it's assumed that the prosecutor knows it. And it's imputed to the prosecution as part of that team. And in this case, it was not – it was known and it was used. If I can briefly respond, and I'll leave at least a minute of time there, on the issue of the quantity and the sufficiency and the instructions. Those phone calls are very unclear as to what is meant. There's a talk about a chicken. Then there's argument, well, then there's talk about girls. And then there's an argument at some point maybe it's a truck. But there's no real showing that it is – now it's four separate. The PSI said, well, there may be three, but we're not really sure. And at trial, the government argued that there was at least one pound. And I think that's all that the showing is, is that there was no showing that they actually got more, that they were looking for more, other than just going around to different places to try and get that pound. So I would submit that on the record and on arguments, unless there are any questions. Anything further? Thank you very much. This matter is also submitted and the court will – what time do we start tomorrow? 9 a.m.? What? 9? You sure? Okay. 9 it is. Okay. Okay. All right. Maybe 9, maybe some other time. Okay. Thanks for coming. I wanted to point out – see that picture there? You recognize him? I know. I wanted to see how smart they are. I know. That's Otto. Okay. All right. I withdraw that question.
judges: Goodwin, Pregerson, Wardlaw